·(23 Misc. Rep. 304.)

## HANSCHALL v. SWAN.

(Supreme Court, Trial Term, New York County. April 9, 1898.)

1. APPEAL—FINDINGS OF FACT BY COURT.
      The findings of fact of a court, upon a motion by both parties for judg-
      ment, have the force and effect of a verdict of a jury.

2. BOTTOMRY.
      The master of a ship in a foreign port gave a draft on the owners for
      money advanced for wages and supplies. *Held*, the instrument was an ab-
      breviated form of bottomry.

3. SAME—LIEN.
      The master of a ship pledged his vessel, freight, and owners for the payment
      of money advanced for wages, supplies, etc., giving a draft payable after
      arrival and discharge. Before reaching its destination the ship became dis-
      abled, and was repaired by money raised upon bottomry, and was sold to
      satisfy same. Suit was instituted on the draft. *Held*, that by the creation
      of the prior liens the holder of the draft lost his lien upon the vessel and
      freight.

4. AUTHORITY OF MASTER.
      The master of a ship in a foreign port cannot, at common law, make the
      owners responsible for money not actually necessary, though he may pretend
      that it is.

5. ADVANCES TO MASTER—LIABILITY OF OWNERS.
      A party advanced money to take up bills of a ship in a foreign port, in
      the sum of $300, and later advanced the master in cash $414.78. The mas-
      ter used $300 of the latter amount personally. The last advance was given
      under circumstances that should have aroused inquiry into the necessity
      therefor. *Held*, the owners of the ship could not be held liable for the
      amount used personally by the master.

6. CONFLICT OF LAWS.
      A contract for money advanced for wages and supplies for a ship in a
      foreign port is governed by the law of the country from which the ship sailed.

7. SHIPPING—EVIDENCE OF OWNERSHIP.
      A complaint alleged the individual ownership of a vessel. This the an-
      swer denied. The proof introduced by complainant showed that defendant
      was the executor of a part owner, and used a portion of his decedent's estate,
      his interest in the ship, in his individual business. *Held*, the proof did not
      make the defendant an individual owner.

8. PLEADING AND PROOF.
      A variance occurred between the allegations and proof, but defendant did
      not move to dismiss.. *Held*, that the court must render such judgment as
      the evidence warranted.

9. DINGLEY BILL—LIABILITIES OF PART OWNERS.
      A party advancing money to the master of a ship, without its owners'
      knowledge, would not have a personal claim against the owners, but a
      claim in the proportion that each individual share bore to the whole liability,
      as provided by Act Cong. 1884 (23 Stat. 57, § 18).

10. SAME—LIMITING LIABILITY.
      Under Act Cong. 1884 (23 Stat. 57, § 18), fixing the liability of shipowners,
      a part owner, having a claim presented against him, may bring in all cred-
      itors, and distribute to them his proportion of their demands, and may have
      an injunction to restrain future suits.

11. LIABILITY OF EXECUTORS.
      A part owner's interest in a ship was one thirty-second. He died leav-
      ing a will which appointed three executors. Suit was brought against one
      executor on a claim against the ship. *Held*, that the executors were joint
      tenants, and the one sued was liable to the extent of his decedent's interest.

Action by Valdemar Hanschall against John Swan. Judgment for
plaintiff.

Hotchkiss & Maddox, for plaintiff.

Cowen, Wing, Putnam & Burlingham, for defendant.

COHEN, J. In September, 1894, the American brig John H. Crandon, of New York, arrived at Barbadoes, West Indies, seeking employment, and consigned to the plaintiff, a merchant residing on that island. The defendant is a citizen and resident of this state. His father, also a resident of New York, died in January, 1894, leaving a will, admitted to probate in Kings county, whereby he appointed the defendant and two others his executors. The executors received letters testamentary in February, 1894; and one thirty-second of the brig Crandon passed into their possession, as a part of the estate of Swan, Sr., deceased. The defendant, being a shipping merchant, continued to act as the managing agent of the Crandon, and the voyage on which she went to Barbadoes was made at his instance. The master of the Crandon, finding himself in want of funds while awaiting charter at Barbadoes, applied to the plaintiff for money alleged by him to be necessary for wages, supplies, and repairs, and the port charges of his brig. The plaintiff thereupon paid certain bills incurred by the captain, and advanced him some cash, bills and cash together amounting (with the plaintiff's commission) to $714.78 (or £150. 9s. 8d.), for which sum the master gave a draft payable 10 days after his vessel's arrival at port of discharge in Europe, and for the payment thereof pledged his "vessel, her freight and owners." The Crandon obtained a charter for Bremen, but, having met with disaster while crossing the Atlantic, put into Bermuda in distress, and was there repaired with money raised upon bottomry, on her arrival in Bremen was sold. and, her proceeds being absorbed by maritime liens prior to the draft above referred to, the plaintiff, as the holder thereof, was left no recourse other than suit against the owners of the Crandon. This action is upon the draft given by the master. The defendant is sued individually, as one of the Crandon's owners, and judgment is demanded for the full amount of the instrument in suit.

By commission to Barbadoes, the plaintiff has shown the circumstances under which this draft was given. He has also introduced as his own witness the late master of the Crandon, from whose testimony I find as a fact that the cash received by him from the plaintiff, covered by the draft in suit, and amounting to $414.20, was given without any knowledge or inquiry on the part of the plaintiff as to the necessity of so large a sum for the purposes of the ship; that the master told the plaintiff that he wanted this money for labor and repairs, for necessaries for the ship, and for crew's wages; that as matter of fact the master applied $314.20 of the moneys received either in extinguishment of his own existing claim for wages, or in payment of claims for his future services, and actually expended this $314.20 for his own personal use and gratification; the remaining $100 he applied to the payment of the crew or for their necessities. I further find that the master of the Crandon did not need more than $100 cash at Barbadoes for the necessities of his ship and crew, in addition to the bills paid for him by the plaintiff and included in

the draft in suit; and that the balance of the cash advanced, $314.20, was improperly obtained and wrongfully expended. There is no direct evidence as to what would have been a usual and reasonable amount to cover the disbursements of a ship of the Crandon's size at Barbadoes, but a comparison of the amount advanced the Crandon with the advances to other vessels touching at Barbadoes, and consigned to the plaintiff, and the fact that $300 of the $414.20 was given the Crandon's master at one time, and after $114.20 had been paid out in small sums, leads me also to find that the plaintiff, by the extravagance of the master's demands, should have been roused to inquiry which would at once have revealed the impropriety of the last advance of cash. I find the facts to be as hereinabove set forth, and in so doing have considered as admitted in evidence all the answers to all the interrogatories addressed to the witness McCormick, some of which were provisionally excluded at the trial.

Both parties have moved for a direction of a verdict, the plaintiff demanding the face of his draft with interest, and the defendant claiming that since his decedent owned but one thirty-second of the brig, and appointed by his will three executors, all of whom qualified, he is liable under the act of congress of June 26, 1884 (commonly known as the "Dingley Act"), for but one ninety-sixth of the amount justly found due by all the owners. Under these circumstances, the duty is imposed upon the court of ascertaining the facts of the case as well as the law applicable thereto, its findings of fact having the force and effect of the verdict of a jury. Shultes v. Sickles, 147 N. Y. 704, 41 N. E. 574.

Both parties to this action have assumed in argument that the master of the Crandon, by pledging not only his vessel and freight, but "her owners," rendered such owners liable for whatever sums the plaintiff was justified in advancing, and that this liability nothing but the Dingley act can lessen or destroy. It may well be doubted whether such results flowed from the transaction under consideration. The instrument in suit is a "master's draft," which is but an abbreviated form of bottomry. The Pride of The Ocean, 3 Fed. 162. If the master of the Crandon had not specifically pledged the credit of his owners, no liability would have attached to them beyond the amount of assets coming into their hands and growing out of the hypothecated vessel and freight. The Virgin, 8 Pet., at page 554. If, as a part of the bottomry transaction, the master had drawn a draft on his owners payable absolutely, the attempted hypothecation would have been invalid. Stainbank v. Fenning, 11 C. B. 51; Greely v. Smith, 3 Woodb. & M. 236, Fed. Cas. No. 5,750. And it has been frequently held that if a bottomry bond be given, and a bill drawn on the owners for the same amount, the bill must share the fate of the bond. The Hunter, 1 Ware, 249, Fed. Cas. No. 6,904; Maitland v. The Atlantic, Newb. 514, Fed. Cas. No. 8,980.

It is not perceived that uniting in one instrument the hypothecation of the vessel with the draft on the owners personally changes the principle of the cases cited. If the Crandon had been lost before arrival at her "port of discharge," the plaintiff would have wholly lost his money; and this is the essential feature of the transaction

under review that renders it a clear case of bottomry.   He has by the creation of prior liens lost the security of the vessel and freight as thoroughly as if the Crandon had sunk outright, and it is questionable, in view of the language of the court in The Virgin, supra, and of Taney, C. J., in Naylor v. Baltzell, Taney, 55, Fed. Cas. No. 10.061, whether he has not lost his recourse against the owners with the loss of lien on the vessel; whether the owners' liability has not vanished with their ownership; or, to vary the statement, whether it is within the power of a shipmaster to add to a valid marine hypothecation of his vessel and freight any pledge whatever of his owners' personal credit, beyond the proceeds of the hypothecated property coming into their hands.   As, however, no decision has been brought to my attention precisely covering the facts here presented, I shall assume, with the parties litigant, that the Crandon having arrived at a port of discharge in Europe, and the plaintiff having lost his lien upon her by no fault of his, he is entitled to pursue her owners under the language of the draft.

By common law, the authority of a master in a foreign port is limited by the necessity of the case, and he cannot make the owners responsible for money not actually necessary, although he may pretend that it is.   Grant v. Norway, 10 C. B. 665.   This severe rule has been modified in instances where the lender neither knew nor had reason to suspect that the money loaned was not necessary. The Grapeshot, 9 Wall., at page 141; The Lulu, 10 Wall., at page 202.   In this case it being my opinion that the last advance of $300 obtained by the master was given under circumstances that should have aroused to inquiry any prudent man accustomed to shipping, I disallow it, and hold that the master's act rendered the owners of the Crandon liable at common law for no more than $414.78.

It remains to ascertain by what law this contract is to be interpreted; the plaintiff contending that, Barbadoes being a British dependency, and no proof of foreign law having been offered, the common law is to be applied, by which one part owner or person liable as such is responsible in solido for debts lawfully incurred by the shipmaster.   The first portion of this proposition is directly opposed to the judgment of Story, J., in Pope v. Nickerson, 3 Story, 465, Fed. Cas. No. 11,274, wherein it was held that the master in a foreign port has no power to bind his owners personally beyond the authority given him by them, which must be limited to their express instructions, or such as are to be implied from the law of the country whence the ship hails and where her owners reside; for there the authority is given, and by that law it is to be interpreted.   It is supposed that the judgment in Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S., at page 458 et seq., 9 Sup. Ct. 469, has overruled Justice Story's decision, has displaced the "law of the flag" as applicable to this case, and substituting the assumed law of Barbadoes, that being the locus contractus.   It is sufficient to observe that the case last cited arose from a contract of affreightment, and holds only that the parties to such a contract, made in New York, by New York shippers, with a shipowner regularly transacting business there, "must be presumed to have sub-

mitted themselves to the law there prevailing" (page 459, 129 U. S.,
and page 478, 9 Sup. Ct.); and does not in terms or by indirection
overrule Pope v. Nickerson, supra, on the point judicially decided
therein, which point is directly applicable to the proposition now
under discussion.   Nor is the case of The Scotia, 35 Fed. 907, op-
posed to the decision of Justice Story.   That case involved the en-
forcement of a maritime lien, and it may well be admitted that the
Crandon's captain lawfully pledged his vessel at Barbadoes (per-
haps in defiance of the law of his flag), and thereby created a lien
enforceable in the admiralty courts of every country, without rais-
ing any presumption that his owners personally and individually
must by his act "be presumed to have submitted themselves to the
law there prevailing."   Pope v. Nickerson, supra, has been re-
ferred to with distinct approval by our own court of appeals (King
v. Sarria, 69 N. Y., at page 33); and, both on principle and authority,
I am satisfied that the contract here to be enforced is governed by
the law of New York, of which the General Statutes of the congress
of the United States are an integral part.

What protection, therefore, does the Dingley act afford to this
defendant, who, if not entitled to its benefits, must respond for the
full amount used for necessaries?   Before approaching the merits
of this branch of the case, the plaintiff asserts that, because the
defendant has not pleaded the Dingley act, he is entitled to none of
the benefits thereof.

Upon the record before me, I do not find it necessary to decide
the point thus raised, which is based on the peculiar nature of the
act in question; for I do not understand the plaintiff to assert that
this court ordinarily needs proof of the existence of a general stat-
ute of the national congress.   The complaint herein alleges that
defendant individually was an "owner" of the Crandon, and it shows
no other ground of liability than such ownership.   This allegation
the answer denies.   Under these pleadings, the plaintiff has not
even attempted to prove the alleged ownership.   His evidence and
argument both show that the real ground on which the defendant
is sought to be charged is that, being one of the executors of a part
owner, he used a portion of his decedent's estate, i. e. the brig Cran-
don, in a business venture, not even begun by the decedent, and
not necessary for the settlement of such decedent's estate.   He is
therefore liable individually on the engagement of his agent, the
shipmaster, as if he were in his own right a part owner of the brig.
Austin v. Munro, 47 N. Y. 362; Thompson v. Whitmarsh, 100 N. Y.
35, 2 N. E. 273.   This is true, but it does not make the defendant
individually an' owner.

The defendant, however, has not moved for a dismissal of the
complaint on the ground of this material variance between allega-
tion and proof; and the court must therefore consider the cause
of action disclosed by the evidence, and give such decision as is war-
ranted thereby.   To do otherwise would be error.   Knapp v. Si-
mon, 96 N. Y., at page 292; Holcomb v. Campbell, 118 N. Y. 46, 22
N. E. 1107.   One who propounds a complaint fatally defective can
hardly complain of an answer sufficient to defeat his complaint;

and without deciding that, under any circumstances, it is necessary to plead that portion of the statute in question on which defendant relies, I shall consider whatever application it may have to the facts. here proven.　The act is as follows:

"That the individual liability of a shipowner shall be limited to the proportion of any or all debts and liabilities that his individual share of the vessel bears to the whole; and the aggregate liabilities of all the owners of a vessel on account of the same shall not exceed the value of such vessels and freight pending." Act June 26, 1884, § 18; 1 Supp. Rev. St. U. S. p. 443.

It is urged that this statute does not affect the liability of a shipowner for his personal contracts; and this is true (Laverty v. Clausen, 40 Fed. 542, and cases cited; McPhail v. Williams, 41 Fed. 61); but the contract under consideration is not the personal contract of this defendant or any owner of the brig Crandon.　The plaintiff paid the bills and advanced the money covered by the draft in suit upon the request of the Crandon's captain alone, and "without the privity or knowledge of this defendant or the other owners, and without any contract with them, except so far as the master had implied authority to bind them as part owners for necessaries." Whitcomb v. Emerson, 50 Fed. 128.

It is further contended that, as this statute has frequently been held to be in pari materia with the limited liability act of 1851 (Rev. St. U. S. § 4283 et seq.), it is necessary, in conformity with the practice under that statute, to prove and surrender the value of the vessel out of which the claim in suit arose (or of the defendant's interest in such vessel), and then limit the plaintiff's recovery to the value so proven.　This interpretation of the statute confessedly does violence to the apparently plain meaning of the first sentence of section 18; but it is argued that unless, in this case, the defendant shows what one thirty-second of the Crandon was worth, and limits the plaintiff's recovery (and all other just claims) to that amount, he may be compelled to continue paying to other plaintiffs one thirty-second parts of their several claims until his share in the Crandon becomes a trifle compared to the aggregate of judgments against him; or, it is said, a claim for $32,000 may be pressed against the owner of one thirty-second of a vessel worth $3,200, and the question asked, shall such owner of a hundred-dollar share be compelled to pay $1,000?　Doubtless, the claims against the owners of a vessel may vastly exceed the value of their vessel, and it is true that the results above indicated may occur, if the owners are sufficiently ill advised to suffer them, and rely only on the first sentence of section 18, supra; but it seems plain that under the second sentence thereof proceedings may be taken analogous to those long familiar under the act of 1851, supra, to bring all the creditors of the shipowners into concourse, distribute to them the value of the ship and her freight, or of the shares of those owners taking the proceedings, and by injunction restrain future suits or demands.　Nor is it doubtful that a single part owner of vessel property may, in a proper case, limit his liability, as above indicated. under the second sentence of section 18, to the value of his own interest.　If, in the case last supposed, one person owned the

whole of a vessel worth $3,200, he would under the first sentence of section 18 be obliged to pay the whole of a claim of $32,000, which would obviously compel him to institute proceedings under the second sentence of the statute; and, if an individual owning an entire ship can pursue this course, there is no reason, and nothing in the statute considered in its entirety, preventing an owner of but a small fraction of a ship limiting his liability to the whole world to the value of his fractional ownership.

Doubtless the portion now under consideration of the act of 1884 might be more clearly expressed; but, while believing its correct interpretation to be as above indicated, it is, for the purposes of this case, sufficient to quote the language of Webb, J., in The Giles Loring, 48 Fed., at page 474:

"This statute was evidently designed to modify in some way the liability previously imposed by law, and to relieve shipowners of some portion of that liability. * * * Relief in this way is not in terms made to depend upon the condition that the owners are in position to take advantage of the other portion of the statute, and be discharged of all liability beyond the value of their shares of the vessel. The burden of a part owner who can free himself from debt or obligation by the surrender of his interest in the vessel did not more urgently appeal to be lightened than that of him who must respond to the full extent of the liability, however small the value of the property. * * * That end would be promoted by discharging part owners from liability in solido for the debts of each other. A construction giving such discharge is consistent with the language of the act, conforms with the intention of congress, and regards strictly the defect to be corrected."

In this case the claim is confessedly of a nature capable of being limited, the defendant has apparently taken no steps to ascertain whether there are other claims against him arising out of his conduct with the brig Crandon, and is content to rest upon the partial and entirely new protection afforded to shipowners by the first sentence of section 18 of the act of 1884. To this protection he is entitled, and, if hereafter other claims are presented, it will then be time enough for him to consider whether he should not seek the perfect discharge afforded to him upon surrender of the value of his decedent's interest by the second sentence of the act in question. This is in accord with the judgments in Whitcomb v. Emerson, supra, and Warner v. Boyer, 74 Fed. 873. I cannot, however, accede to the defendant's proposition that he is liable under the Dingley act for but one ninety-sixth of the amount herein allowed. Executors receive the estate of their decedents by the same will, for the same time, and with the right of survivorship. They are therefore joint tenants, seised per my et per tout, and the defendant, as such joint tenant, is liable as if he had owned in his own right as large a share of the brig Crandon as did his decedent.

A verdict in favor of the plaintiff is directed for one thirty-second of $414.78, with interest, amounting in all to $15.68.